UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 08-10435-RGS

ROSEMARY MCGAHEY

v.

HARVARD UNIVERSITY
FLEXIBLE BENEFITS PLAN
and HARVARD UNIVERSITY, as
PLAN ADMINISTRATOR

<u>MEMORANDUM AND ORDER ON
CROSS-MOTIONS FOR SUMMARY JUDGMENT</u>

December 11, 2009

STEARNS, D.J.

Plaintiff Rosemary McGahey brought this action pursuant to the Employee Retirement Income Security Act (ERISA), 29 U.S.C. § 1001, *et seq.*, seeking disability benefits under a self-insured employee benefit plan (Plan) sponsored by Harvard University. McGahey received benefits for twenty-four months until June 30, 2006, when Harvard determined that McGahey was no longer disabled from any gainful employment. Both McGahey and Harvard have moved for summary judgment. A hearing on the motions was held on September 3, 2009.[1]

<u>BACKGROUND</u>

---

[1]The sole remaining count before the court is McGahey's claim to enforce her rights under the Plan pursuant to 29 U.S.C. § 1132(a)(1)(B). Count II of McGahey's Complaint alleging violations of 29 U.S.C. § 1132(a)(3), was dismissed as a matter of law at the hearing. <u>See LaRocca v. Borden, Inc.</u>, 276 F.3d 22, 28 (1st Cir. 2002) ("[F]ederal courts have uniformly concluded that, if a plaintiff can pursue benefits under the plan pursuant to Section a(1), there is an adequate remedy under the plan which bars a further remedy under Section a(3).").

McGahey was born on September 23, 1961.   She resides in Chelsea, Massachusetts, with her two daughters.  In 1983, McGahey earned an Associate's Degree in Culinary Arts and Hospitality from Bunker Hill Community College.  McGahey's entire working career has been dedicated to the food services industry.  Prior to earning her degree, McGahey spent five years as a chef at a nursing facility.  After graduation, McGahey worked for sixteen years (1983-1999) as a senior food service director at Boston University.  From 1999 to 2005, McGahey held the position of Director of Residential Dining at Harvard University.  This case arises from injuries sustained by McGahey while working at Harvard.

The Initial Injury

On February 6, 2004, McGahey slipped on an icy sidewalk on the Harvard University campus, injuring her right knee.  Because of persistent pain and swelling, McGahey remained out of work until March of 2004, when she returned on a part-time basis.  With the aid of physical therapy, McGahey was able to resume work full-time on June 30, 2004.

Second Injury and Aftermath

On August 25, 2004, McGahey fell on a slippery floor in a Harvard University dining hall.  The fall re-injured her right knee and caused pain in her right groin, right hip, and lower right leg.  Harvard notified the Massachusetts Department of Industrial Accidents (DIA) that McGahey was totally disabled as of August 27, 2004.  She was  placed on restricted duty hours on August 30, 2004.  McGahey's last day of work was September 2, 2004.  She quit working after her treating physician, Dr. John M. Siliski, recommended that

she do so.

An MRI performed on September 8, 2004, revealed swelling in McGahey's right knee. She received physical therapy through September of 2004. The therapists noted McGahey's complaints of increasing pain in her knee and an onset of pain in her lower extremities and back.

On October 11, 2004, McGahey, at Harvard's request, presented to Dr. Brian McKeon for an independent medical examination (IME). Dr. McKeon diagnosed McGahey as "hypersensitive to pain" with specific symptoms that included: "diffuse anterior knee discomfort"; "tenderness along the medial parapatellar region"; "point tender in her volar patellar tendon and lateral facet soft spot directly off the bone"; and "exquisite hip pain." In reviewing a September 8, 2004 MRI of McGahey's knee, Dr. McKeon "did not see any significant atrophy or any major concerning issues with regard to her knee." Dr. McKeon was satisfied with McGahey's therapy regimen and cleared her for work "completely as tolerated" with "mild restrictions only, based on how she felt." Dr. McKeon indicated concern about the possibility of a hip labral tear. He recommended another MRI.

Following Dr. McKeon's recommendation, McGahey underwent an MRI of her right hip in October of 2004. On October 29, 2004, McGahey presented to Dr. Geoffrey Van Flandern, an orthopedic surgeon at New England Baptist Hospital. Based on a physical examination, Dr. Van Flandern concluded that McGahey's "knee is under control for the most part." Dr. Van Flandern focused on McGahey's right hip, which he believed was "creating a lot of problems still with her knee." Based on the MRI and his examination, Dr. Van Flandern diagnosed McGahey with a "right hip anterosuperior labral tear." He

recommended surgery to repair the tear because of the minimal progress achieved by physical therapy during the previous eight months.  McGahey agreed to the surgery, which was performed by Dr. Van Flandern on November 24, 2004.

During a follow-up examination on December 7, 2004, Dr. Van Flandern noted that McGahey walked with the assistance of a crutch and exhibited "quite a limp" on her right side.  He recommended the resumption of "some" physical therapy.  He also  prescribed an anti-inflammatory and a pain medication (Voltaren).  According to Dr. Van Flandern's notes, "[McGahey] is limited to only work duties that would involve extremely sedentary duties from her home."

On January 11, 2005, Dr. Van Flandern submitted an affidavit to Harvard stating that McGahey could work "from home only" up to "1-2 hours with frequent breaks" and that her prognosis was "guarded."  In a follow-up report on February 15, 2005, Dr. Van Flandern opined that McGahey had "total temporary disability."  He also expressed concern about the lack of improvement in her feelings of pain.  Dr. Van Flandern referred McGahey to Dr. James Rainville at the New England Baptist Hospital Spine Center for an assessment of the possibility of lumbar pathology.  Dr. Rainville sent McGahey for an MRI of her lumbar spine on February 14, 2005.

In March of 2005, Dr. Van Flandern ceased treating McGahey.  McGahey began seeing Dr. Mark Weiner, a neurologist.  She continued to see her primary care physician, Dr. Timothy Tierney.   Dr. Weiner's diagnosis of McGahey, based on a physical examination and the MRI of her lumbar spine, was "right knee internal derangement"; "right hip internal derangment" following "failed surgery for repair of right superolateral labrum

tear"; and "mild central and right paracentral disk herniation with annual tear and moderate facet arthropathy." On March 28, 2005, Dr. Weiner opined that McGahey's injuries to her knee, hip, and lower back amounted to a "total disability from her employment." Dr. Weiner prescribed the pain medication Neurontin. He reaffirmed his diagnosis in a letter submitted to Harvard on November 12, 2005.

On May 3, 2005, McGahey presented to Dr. George McManama, an orthopedic surgeon, for a second Harvard-requested IME. After conducting a physical examination and reviewing McGahey's MRIs, Dr. McManama parted company with McGahey's treating physicians. He found no evidence of internal derangement of McGahey's right knee. He noted that McGahey's "subjective complaints are truly greater than any objective findings." Dr. McManama diagnosed McGahey as "demonstrat[ing] positive Waddell signs for over-reactivity to painful stimuli and symptom magnification."[2] However, he was also of the opinion that the lumbar spine MRI disclosed a "questionable disc herniation to the right side at L5-S1." Dr. McManama recommended additional testing, but thought that because of the disc herniation, McGahey had only a "light duty work capacity with restrictions." After a second IME conducted on November 17, 2005, Dr. McManama repeated his initial assessment. He stated that "[i]t is certainly conceivable that [the herniated disc] is giving [McGahey] ongoing symptoms of right low back, buttock, and leg pain," and recommended a lumbar epidural steroid injection. He deemed McGahey incapable of returning to her old job, but again found her capable of "light duty work with restrictions."

---

[2]"Waddell signs" are physical symptoms that may indicate a psychological component to lower back pain. See Gordon Waddell et al., *Nonorganic Physical Signs in Low-Back Pain*, 5 SPINE 117, 117-125 (1980).

In July of 2005, McGahey began seeing Dr. Michael Marcus, a psychiatrist.  Prior to her work-related injuries, Dr. Marcus had treated McGahey for unrelated psychological issues dating back to 1971.  Dr. Marcus diagnosed McGahey as suffering from "major depression; anxiety."

Upon learning of McGahey's psychological treatment, Harvard ordered an IME from Dr. Michael Rater, also a psychiatrist.  Following a one-hour examination on January 19, 2006,  and a review of McGahey's medical records, Dr. Rater diagnosed McGahey with "major depression disorder, single episode, moderate," and pre-existing conditions for "anxiety disorder," "premenstrual dysphoric disorder," and "nicotine dependence." Regarding McGahey's ability to work, Dr. Rater opined that "McGahey does not meet the definition for Long Term Disability for Harvard University, based on her psychiatric condition."  Dr. Rater also noted that McGahey "was irritable and was less patient with people, so this would influence the sort of employment she would get, but it would not preclude employment."

In the meantime, McGahey, at Harvard's behest, had filed a claim for workers' compensation.  In conjunction with the claim, she was examined by Dr. Joseph Ferrone, an orthopedic specialist, on February 22, 2006.  Dr. Ferrone diagnosed McGahey with "herniated nucleus pulposus, L5-S1, right, causing right sciatica"; "contusion, right knee"; and "labral tear of the right hip, by arthrogram and arthroscopy."  Dr. Ferrone's diagnosis differed from Dr. McManama's in that he found no Waddell signs.  Dr. Ferrone concluded that "the right knee internal derangement and right hip internal derangement would not be likely to result in total disability from employment.  However, the L5-S1 disc herniation

could result in total disability from employment."

Non-Medical Assessments

On January 19, 2006, Harvard commissioned Susan Chase, a consultant with Occupational Resource Network, to conduct a vocational assessment of McGahey. Based on a forty-five minute meeting with McGahey and a review of the medical records, Chase concluded that McGahey was capable of sedentary work. Chase identified five jobs in the Boston area suited to McGahey's professional qualifications and physical limitations.

McGahey submitted to a second vocational assessment in conjunction with the workers' compensation proceeding. On June 12, 2006, Amy Vercillo, a vocational counselor with Rehabilitation and Re-Employment, Inc., met with McGahey for four-and-a-half hours. Based on this interview and a review of McGahey's medical records, Vercillo reported on September 12, 2006, that "the combination of physical and psychological restrictions would preclude any work [by McGahey] in the labor market."

Initial Benefits Received Through the Plan

On November 9, 2004, McGahey submitted an application to Harvard for total disability benefits. On January 13, 2005, the Benefits Administrative Committee (BAC) approved McGahey's initial claim for benefits retroactive to November 11, 2004, expiring on April 30, 2005. In a letter notifying McGahey of the approval, Harvard informed her of the standard applied to disabilities of less than two years in duration.

> For the purpose of determining the commencement of Total Disability, and thereafter for a period of 24 consecutive months, Total Disability means the inability of the Participant to discharge his or her normal (or comparable) job responsibilities in a satisfactory manner because of a medically determined physical or mental impairment.

Under the award, McGahey received 60 percent of her pre-disability Harvard salary (a combination of workers' compensation and Plan benefits).  This amount was conditioned on any offset from a future award of Social Security Disability Insurance (SSDI) benefits.  McGahey also received, as provided by the Plan, health insurance, dental plan insurance, life insurance, and retirement contributions, at her pre-injury levels.[3]

On April 13, 2005, the BAC extended Total Disability benefits to McGahey through July 31, 2005.  A second extension was granted on July 14, 2005, through February 28, 2006, the twenty-four month anniversary of her initial disability claim.  The July 14, 2005 extension notice informed McGahey that a different standard would apply in her February review.

> After the first 24 months following commencement of the Total Disability, Total Disability means the inability of the Participant, because of a medically determined physical or mental impairment, to engage in any substantial gainful activity which other individuals of similar age and with similar education, training and work experience are actually engaged in as a means of financial support.

Social Security Disability Insurance - Initial Denial

Under §10.10 of the Plan, McGahey was obligated to "diligently attempt" to obtain offsetting SSDI and workers' compensation benefits.  McGahey filed an application for SSDI benefits on November 19, 2004.  On June 7, 2005, McGahey's SSDI claim was denied.  According to the Social Security Administration (SSA), the following information

---

[3]Because of the workers' compensation and SSDI offsets, the relief McGahey seeks in this action relates solely to the denial of these ancillary benefits.

was considered in making the decision: a report from Dr. Mark Berenson;[4] two reports from Dr. Tierney; Dr. Marcus's report; Dr. Siliski's report; the "New England Baptist Hospital report;"[5] and Dr. Weiner's report.  The SSA concluded that McGahey's complaints of "hip, back and knee pain and depression," were "not severe enough to keep [her] from working." Section 10.10 of the Plan also required McGahey to "further appeal diligently" any denial of collateral benefits.  McGahey promptly filed an appeal with the SSA on June 28, 2005.

Harvard BAC - Initial Denial

On March 8, 2006, the BAC denied McGahey's claim for long-term disability benefits.  According to the BAC, the following information was considered in making its determination: Chase's vocational assessment;  Dr. Rater's IME;  Dr. McManama's IME; Dr. Weiner's office notes of November 12, 2005, and December 12, 2005; the SSA's July 6, 2005 denial of SSDI benefits; and the Medical Advisor's[6] file review, oral explanations, and opinions.  Based on this information, the BAC found that

> [McGahey] had some limitations relating to [her] injury.  After obtaining a full understanding of the information in the medical record and reviewing the Vocational Assessment, [the BAC] found that [McGahey] did not meet the definition of total disability under the post 24-month definition.  In fact, the records stated that [McGahey] would actually be well served by returning to work.

SSDI - Successful Appeal

---

[4]Dr. Berenson was McGahey's treating physician for her initial knee injury from February of 2004 through April of 2004.

[5]It is unclear from the record who at New England Baptist Hospital prepared the report (that is, Dr. Van Flandern and/or Dr. Rainville).

[6]The record does not indicate the identity or duties of Harvard's "Medical Advisor."

McGahey filed an appeal of the denial of her application for SSDI benefits on February 11, 2006.  The appeal was successful and McGahey was awarded SSDI benefits on March 22, 2007.  Administrative Law Judge (ALJ) J. Alan Mackay considered on appeal: testimony from vocational expert, Joann Foley,[7] Dr. Van Flandern's reports, Dr. Weiner's report, Mark Gofstein's[8] (psychotherapist) report, and Dr. Marcus' report.  In his ruling, Judge Mackay stated:

> [a]fter careful review of the evidence of record, I find that the claimant is significantly limited due to her combination of impairments.  Despite the medical treatment, the claimant still walks with a crutch and needs to lie down several times a day and change positions frequently. . . .  The debilitating pain has caused her to breakdown emotionally becoming hopeless and helpless about her life.  The claimant was suicidal. . . . It was also clear that the claimant had been affected by her injuries to the point where she had regressed emotionally. . . . The claimant never had to ask for help in the past, she has always been able to find her own solutions.  Currently, she could not do things due to the intense physical discomfort and disability is such a distraction toward any emotional gains.  Therefore, it is accepted that the claimant is significantly limited due to her combination of impairments.

The Massachusetts DIA - Workers' Compensation Award

On April 4, 2007, McGahey received a second favorable disability determination from the DIA on her claim for workers' compensation.  As in the case of SSDI benefits, McGahey was required under section 10.10 of the Plan to "diligently attempt . . . to obtain" workers' compensation.  An "Order of Payment" from the DIA entered by Administrative Judge Fred Taub stated: "Based on information submitted at the conference, I order the

---

[7]It is unclear from the record if Ms. Foley was employed on behalf of McGahey or the SSA.  Foley's name appears only in the March 22, 2007 SSA opinion.

[8]Gofstein was McGahey's psychotherapist from June 22, 2006, to November 21, 2006.  His name only appears in Judge Mackay's opinion.

insurer . . . to pay the claimant permanent and total incapacity compensation under M.G.L. c. 152, § 34A."[9]   As the party liable for payment of benefits under the DIA decision, Harvard appealed Judge Taub's ruling.[10]

McGahey's BAC Appeal Denied

McGahey filed a timely appeal of the BAC's denial of total disability benefits on September 14, 2006.  To supplement her appeal, McGahey provided the BAC with new information including: a sworn affidavit disputing Chase's vocational assessment based on McGahey's personal knowledge of the food services industry; updated medical reports from her treating physicians (Dr. Weiner and Dr. Tierney); Dr. Ferrone's IME; and Ms. Vercillo's vocational assessment.  The doctors' reports noted that McGahey's complaints of pain had significantly worsened and that she had been prescribed OxyContin and Percocet (which are powerful and potentially addictive painkillers).

Harvard responded by ordering additional IMEs.  On February 1, 2007, Harvard hired Stuart Clayman, Ph.D., a psychologist to conduct another psychiatric evaluation of McGahey.  Dr. Clayman reviewed McGahey's medical records and interviewed her for over four hours.  McGahey was diagnosed by Dr. Clayman with "major depressive disorder, in partial remission"; "some symptoms of panic disorder"; and "presentation consistent with

---

[9]"Under Massachusetts workers' compensation law, 'totally disabled' means one is 'unable to engage in any occupation, or obtain or perform any work for compensation or profit.'"  August v. Offices Unltd., Inc., 981 F.2d 576, 582 (1st Cir. 1992), quoting Cierri's Case, 379 Mass. 914, 914 (1979); Frennier's Case, 318 Mass. 635, 639 (1945).

[10]The court on May 12, 2009, rejected McGahey's request to supplement the record with the DIA award affirmation of March 3, 2009.  The DIA's appellate decision was not available to the BAC when it heard McGahey's appeal on May 11, 2007, and could not have been a factor in its decision.

exaggerated psychological symptoms."[11]  Based on this diagnosis, Dr. Clayman opined:

> McGahey does not meet Harvard's post 24-month definition for long-term disability and I find she is able to engage in 'substantial gainful activity which other individuals of similar age and with similar education, training, and work experience are actually engaged in as a means of financial support.'  I believe she can now perform light duty work, by which I mean low-stress work, for which she has been medically cleared.

Additionally, Harvard commissioned Dr. Hyman Glick, an orthopedic surgeon, to perform an IME of McGahey on February 26, 2007.  Based on a review of McGahey's medical records and a physical examination, Dr. Glick concluded that McGahey's "right knee condition has resolved" and is "not a problem"; that McGahey's right hip "seems to be doing reasonably well"; that the MRI of the lumbar spine showed "mild dessication and degenerative disc signal within the L5-S1 with only a minimal disc bulge"; and that there was "a significant nonorganic (psychological) component to the overall impairment [McGahey] alleges."  Dr. Glick opined that while McGahey could not return to her former job, she was not disabled from all forms of gainful employment.  According to Dr. Glick, "[McGahey] seems suitable for full-time, modified sedentary job categories."

Dr. McManama was directed by Harvard to conduct another IME of McGahey on March 30, 2007.  His opinion remained unchanged.  Dr. McManama diagnosed McGahey with a "mild disc bulge at L5-S1."  He reiterated his view that McGahey "again demonstrates positive Waddell signs for symptom magnification and non-organic signs."  Dr. McManama reaffirmed his diagnosis that McGahey was incapable of returning to her

---

[11]McGahey takes issue with much of the characterization of her psychological examination by Dr. Clayman.  These objections were made known to the BAC in a letter sent by McGahey on April 11, 2007.

former job, but was "capable of full time, light duty work."

Finally, Harvard requested a further vocational assessment from Ms. Chase.  On March 19, 2007, Chase reviewed additional medical records provided by Harvard and McGahey, including the results of the IMEs conducted by Drs. Clayman, Glick, and McManama.  Chase repeated her view that McGahey was capable of working in a sedentary environment, with the added caveat of "low stress."  Chase identified seven jobs in the local economy suitable to McGahey's skills and physical limitations.

On May 11, 2007, the BAC considered McGahey's appeal.  McGahey was told by letter on May 16, 2007, that her appeal had been denied.  The BAC had before it the opinions of McGahey's treating physicians and her vocational expert.  It also reviewed the evidence that had figured in its initial determination, as well as the updated reports of Dr. McManama and Ms. Chase, and the additional IMEs conducted by Dr. Clayman and Dr. Glick.  The April 4, 2007 DIA award was considered by one of the IME physicians, Dr. Clayman, but not by the BAC.  The March 22, 2007 SSDI award of benefits had also been brought to the attention of Ms. Chase, Dr. Clayman, and Dr. Glick by McGahey's attorney. Neither they nor the BAC was swayed.

> The Appeals Committee did not find your being awarded Social Security Disability benefits sufficient to outweigh the opinions of Dr. Glick, Dr. Clayman and Ms. Chase, taken together.  Social Security Disability includes a _different standard_ for determining total disability than the Plan.  For example, the "treating physician" rule applies under Social Security but _not_ under the Plan.

(Emphasis in the original).[12]

---

[12]Under SSA regulations, an ALJ is directed to ordinarily give "more weight" to treating physicians' opinions, "since these sources are likely to be the medical

DISCUSSION

A motion for summary judgment is the procedural vehicle by which the denial of a benefits claim is tested under ERISA. Orndorf v. Paul Revere Life Ins. Co., 404 F.3d 510, 517 (1st Cir. 2005). Summary judgment is, however, a misnomer as a "trial is usually not an option: in a very real sense, the district court sits more as an appellate tribunal than as a trial court. It does not take evidence, but, rather, evaluates the reasonableness of an administrative determination in light of the record compiled before the plan fiduciary." Leahy v. Raytheon Co., 315 F.3d 11, 17-18 (1st Cir. 2002). Because of the quasi-appellate nature of the proceeding, "the non-moving party is not entitled to the usual inferences in its favor." Orndorf, 404 F.3d at 517. De novo review is the default ERISA standard "unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." Firestone Tire and Rubber Co. v. Bruch, 489 U.S. 101, 115 (1989). When a plan administrator is granted such authority, the "arbitrary and capricious" standard of review applies. See Recupero v. New England Tel. and Tel. Co., 118 F.3d 820, 827 (1st Cir. 1997). McGahey concedes that the Plan's language clearly vests discretionary authority in the Plan administrator.

Under the arbitrary and capricious standard, a decision of a plan administrator will be upheld even where contrary evidence might suggest a different result, so long as the

professionals most able to provide a detailed, longitudinal picture of [a claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations." 20 C.F.R. § 404.1527(d)(2). The ALJ, however, is not required to give a treating physician's opinion controlling weight. Arroyo v. Sec'y of Health and Human Servs., 932 F.2d 82, 89 (1st Cir. 1991).

decision "is plausible in light of the record as a whole, . . . or, put another way, whether the decision is supported by substantial evidence in the record." Leahy, 315 F.3d at 17. "Substantial evidence . . . means evidence reasonably sufficient to support a conclusion. Sufficiency, of course, does not disappear merely by reason of contradictory evidence. . . . [The] question [is] not which side [the court] believe[s] is right, but whether [the administrator] had substantial evidentiary grounds for a reasonable decision in its favor." Doyle v. Paul Revere Life Ins. Co., 144 F.3d 181, 184 (1st Cir. 1998). See also Vlass v. Raytheon Employees Disability Trust, 244 F.3d 27, 30 (1st Cir. 2001) ("[T]he existence of contradictory evidence does not, in itself, make the administrator's decision arbitrary."). "It is the responsibility of the administrator [and not the court] to weigh conflicting evidence." Id. at 32.   On the other hand, an administrator's faulty reasoning and mischaracterization of the evidence will not survive an "arbitrary and capricious" standard of review simply because some evidence in the record supports the ultimate decision. Buffonge v. Prudential Ins. Co. of Am., 426 F.3d 20, 30-31 (1st Cir. 2005).

In determining whether an administrator's decision was arbitrary and capricious, a structural conflict of interest is a factor that the reviewing court may consider. Metro. Life Ins. Co. v. Glenn, 128 S. Ct. 2343, 2348 (2008).   A structural conflict exists when, as here, a "plan administrator both evaluates claims for benefits and pays benefits claims." Id. This court has previously interpreted Glenn as permitting a plaintiff, in certain circumstances, to make a "threshold showing that the denial of benefits was improperly influenced by the administrator's conflict of interest," and that further inquiry on the subject is warranted. McGahey v. Harvard Univ. Flexible Benefits Plan, 2009 WL 799464, at *2 (D. Mass. Mar.

15

25, 2009), citing <u>Glenn</u>, 128 S. Ct. at 2352.  These circumstances include: "the extent to which the record discloses efforts to insulate the claims review process from institutional financial considerations; the thoroughness and consistency of the explanation of the denial; the care with which the claimant's own physician's opinions were treated; and, if the administrator relied on the opinion of independent experts, the extent to which these experts were in fact truly independent."  <u>Id</u>.

When a genuine conflict of interest is shown to exist, a review under the arbitrary and capricious standard should be given "more bite."  <u>Doyle</u>, 144 F.3d at 184.  <u>Cf</u>. <u>Leahy</u>, 315 F.3d at 16 (an alleged conflict of interest must not be "chimerical, imagined, or conjectural"); <u>Fenton v. John Hancock Mut. Life Ins. Co.</u>, 400 F.3d 83, 90 (1st Cir. 2003) (for <u>Doyle</u> to apply, a plan participant must show that the adverse determination was improperly motivated).  The Court of Appeals, however, had declined to infer an actual conflict of interest from the mere fact that an entity acts both as insurer and plan administrator, <u>Pari-Fasano v. ITT Hartford Life and Acc. Ins. Co.</u>, 230 F.3d 415, 418 (1st Cir. 2000), or has a generalized concern for the preservation of its assets.  <u>Doe v. Travelers Ins. Co.</u>, 167 F.3d 53, 57 (1st Cir. 1999).  <u>But</u> <u>see</u> <u>Denmark v. Liberty Life Assurance Co.</u>, 566 F.3d 1, 7, 9  (1st Cir. 2009) (noting that <u>Glenn</u> "rejected the market forces rationale" and "no longer allows a reviewing court to disregard a structural conflict without further analysis.").

 "While the Court in <u>Glenn</u> instructed district courts to 'take account of [the conflict of interest] as a factor in determining the ultimate adequacy of the record's support for the agency's own factual conclusion,' 128 S. Ct. at 2352, it declined to establish rules as to

how lower courts should weigh such a conflict."[13] McGahey, 2009 WL 799464, at *1.  The

Supreme Court did, however, observe "that some conflicts of interest are more significant

than others."  McGahey, 2009 WL 799464, at *1.

> [A]ny one factor will act as a tiebreaker when the other factors are closely balanced, the degree of closeness necessary depending on the tiebreaking factor's inherent or case-specific importance.  The conflict of interest at issue here, for example, should prove more important (perhaps of great importance) where circumstances suggest a higher likelihood that it affected the benefits decision, including, but not limited to, cases where an insurance company administrator has a history of biased claims administration.  It should prove less important (perhaps to the vanishing point) where the administrator has taken active steps to reduce potential bias and to promote accuracy, for example, by walling off claims administrators from those interested in firm finances, or by imposing management checks that penalize inaccurate decisionmaking irrespective of whom the inaccuracy benefits.

Glenn, 128 S. Ct. at 2351 (internal citation omitted).   Under Glenn, a district court,

reviewing a benefits-denial decision under a traditional abuse of discretion standard,

should consider "any conflict as one of a myriad of relevant factors."  Denmark, 566 F.3d

at 9.

The court finds four factors in McGahey's case relevant to the Glenn context: (1) the

BAC's disregard of the SSA's disability determination; (2) the BAC's refusal to consider the

---

[13]"Neither do we believe it necessary or desirable for courts to create special burden-of-proof rules, or other special procedural or evidentiary rules, focused narrowly upon the evaluator/payor conflict.  In principle, as we have said, conflicts are but one factor among many that a reviewing judge must take into account.  Benefits decisions arise in too many contexts, concern too many circumstances, and can relate in too many different ways to conflicts – which themselves vary in kind and in degree of seriousness – for us to come up with a one-size-fits-all procedural system that is likely to promote fair and accurate review.  Indeed, special procedural rules would create further complexity, adding time and expense to a process that may already be too costly for many of those who seek redress."

Glenn, 128 S. Ct. at 2351.

initial workers' compensation award; (3) the glossing over of the opinions of McGahey's treating physicians; and (4) the questioned impartiality of the doctors who conducted the IMEs for Harvard.

McGahey argues that her case is like <u>Glenn</u> and other cases in which an administrator cites an SSDI determination favorable to the plan as a reason for denying benefits and then ignores an SSDI redetermination unfavorable to the plan in deciding an appeal. The <u>Glenn</u> Court specifically noted the "procedural unreasonableness" of requiring an employee to seek SSDI benefits, but then minimizing an adverse determination when the "seemingly inconsistent positions were both financially advantageous" to the insurer. 128 S. Ct. at 2352. Harvard, for its part, argues that its Plan has a stricter standard for assessing disability than the one used by the SSA: while an SSDI determination may be a necessary precondition for meeting the Plan criteria for a finding of total disability, it is not in and of itself a sufficient condition.[14]

McGahey also argues that the total disregard of the workers' compensation award is further evidence that the BAC's decision was arbitrary and capricious. While the record

_____

[14]The court agrees with McGahey that the stated criteria for an SSDI determination are not so substantially different than those used by the Plan so as to justify a total disregard of an SSA determination. The language in section 2.38(b) of the Plan defines "Total Disability" as "the inability of the Participant, because of a medically determined physical or mental impairment, to engage in any substantial gainful activity which other individuals of similar age, and with similar education, training and work experience, are actually engaged in as a means of financial support." The Social Security Act (42 U.S.C. § 423(d)(2)(A)) defines "disability" as "physical or mental impairment or impairments . . . of such severity that [one] is not only unable to do [her] previous work but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . ."

indicates that Dr. Clayman made note of the DIA award,[15] the BAC did not acknowledge it, or even mention it as being among the documents available to it for review.[16]  Like the SSA decision, the DIA award deserves at least some consideration as evidence that McGahey was disabled.[17]  (Harvard, it may be noted, was at the time vigorously contesting the DIA award, presumably out of financial self-interest).[18]

McGahey further alleges that "Harvard breached [its] fiduciary duty of impartiality and repeated[ly] put its thumb on the scale used to evaluate [her] claim" by selecting "independent" medical examiners that it had every reason to believe would find McGahey

---

[15]It is unclear from the record if any of the other IME physicians were informed of the DIA award.  The Appeals Court in Glenn took cherry-picking into account as a factor to consider in weighing a decision against the arbitrary and capriciousness standard. 128 S. Ct. at 2352. Cf. Cusson v. Liberty Life Assurance Co. of Boston, 2008 WL 4457862, at *22 (D. Mass. Sept. 30, 2008) ("A plan administrator's decision might be unreasonable – and therefore an abuse of discretion – if the administrator acted unreasonably in the process of considering the benefits claim. This could include, for instance, refusing to consider probative evidence offered by the claimant or otherwise stacking the deck in favor of denial, such as by purposely selecting biased experts, manipulating information supplied to evaluators, making strained or unwarranted inferences, and the like.").

[16]The Appeals Court in Glenn went further than the Supreme Court in dicta in stating that "failure to consider evidence that is offered after an initial denial of benefits renders a final denial of benefits arbitrary and capricious."  Glenn v. Metro. Life Ins. Co., 461 F.3d 660, 672 (6th Cir. 2006), aff'd, 128 S. Ct. 2343 (2008).  The Court of Appeals' statement is consistent with the implementing regulations of ERISA, which stipulate that an appeal will "not be deemed to provide a claimant with a reasonable opportunity for a full and fair review" unless "all comments, documents, records, and other information submitted by the claimant relating to the claim" is taken into account.  29 C.F.R. § 2560.503-1(h)(2)(iv).

[17]Harvard responds, unpersuasively in my view, that the DIA award was of "minimal relevance" because Judge Taub offered "no rationale" for his decision.

[18]As with the SSDI determination, Harvard claims the Plan imposes a more demanding disability standard than does the DIA.  This may be true, but it is not a reason justifying the failure to give any consideration whatsoever to the DIA determination.

sound of mind and body and thus capable of working. This is a highly charged accusation, but given the closeness of the case (in light of the of the convincing opinions of McGahey's treating physicians), the court granted McGahey discovery outside of the administrative record to probe the independence of the three challenged Harvard examiners. Specifically, the court ordered Harvard to produce for the period from February 1, 2004, to May 31, 2007: "(1) the total number of IME reports it commissioned from Drs. McManama, Clayman, and Glick; (2) the raw number of claims that each of these doctors recommended be denied; and (3) the raw number of claims that each of these doctors recommended be allowed." McGahey v. Harvard Univ. Flexible Benefits Plan, 260 F.R.D. 10, 12 (D. Mass. 2009). Cf. Weed v. Prudential Ins. Co. of Am., 2009 WL 2835207, at *3 (D. Mass. Aug. 28, 2009) (granting additional discovery for numbers of claims and ratios of denials by reviewing physicians).

The parties, as might be expected, disagree over the interpretation of the discovery that was produced. Harvard claims that there is no demonstrable pattern to the conclusions reached by its examiners in the prior IMEs. The court disagrees. McGahey points out that Dr. McManama recommended denial of every long-term disability claim in the twenty-two cases that he reviewed for Harvard during the specified time period. Dr. Clayman recommended denial in 80 percent of the cases he reviewed (twenty-five of thirty-one).[19]

---

[19]McGahey concedes that the single IME performed by Dr. Glick during the relevant time period "may not suffice to discern a statistical picture of his tendencies." McGahey, in a Supplemental Memorandum, offered extrinsic evidence regarding Dr. Glick in an attempt to show his bias in other cases. Harvard moved to strike these references and exhibits as beyond the scope of the administrative record and the limited additional

Fourteen medical professionals treated McGahey or were consulted in her case. Of the fourteen, only the three doctors employed by Harvard concluded that she was malingering.  There is nothing necessarily sinister afoot.  It may simply be that the examiners chosen by Harvard have a skeptical view of patient complaints (many doctors do), or from personal experience may have acquired a jaundiced view of disability claimants.  But when their opinions are factored into the refusal of the BAC to consider the SSDI and workers' compensation awards, and its seeming indifference to the opinions of McGahey's treating physicians, the court is of the view that the BAC's decision was arbitrary and capricious.  It is true that the arbitrary and capricious standard is highly – one might even say reverentially – deferential to plan administrators.  It is also true that plaintiffs seldom if ever prevail when the standard is applied.  But seldom if ever cannot mean never at all, or the promise made to claimants that federal courts will review their benefits decisions for abuses of discretion would be a cruel and illusory exercise.

Attorney's Fees and Costs

McGahey also requests attorney's fees and costs.  The discretionary award of attorney's fees is permitted under ERISA.  Cottrill v. Sparrow, Johnson & Ursills, Inc., 100 F.3d 220, 225 (1st Cir. 1996).  ERISA provides that the court "in its discretion may allow a reasonable attorney's fee and costs of action to either party."  29 U.S.C. § 1132(g)(1). The Court of Appeals has identified five non-exclusive factors that a court should consider when ruling on an application for fees under ERISA:  (1) the bad faith or culpability of the

---

discovery allowed by the court.  The court agrees with Harvard and will allow the motion to strike.

ERISA decision maker; (2) the ability of the plan or the administrator to satisfy an award of fees; (3) whether an award would have a deterrent effect in similar cases in the future; (4) the extent to which the litigation conferred a benefit on other plan members; and (5) the relative merits of the parties' positions.  Gray v. New England Tel. and Tel. Co., 792 F.2d 251, 257-258 (1st Cir. 1986).  See Doe, 167 F.3d at 61.  The court finds that factors (2), (3), (5), and possibly (1), suggest that an award of reasonable attorneys' fees may be appropriate.

ORDER

For the foregoing reasons, McGahey's motion for summary judgment is GRANTED. Harvard's cross-motion for summary judgment is DENIED.  Harvard's motion to strike the submission regarding Dr. Glick is ALLOWED.  As the prevailing party, McGahey shall file within ten (10) days of the date of this decision a proposed Form of Final Judgment for the court's approval.  The Clerk will then enter judgment for McGahey and close the case. McGahey's counsel may file a suitably documented application for an award of *reasonable* attorney's fees and costs within twenty-one (21) days of the date of this opinion.

SO ORDERED

/s/ Richard G. Stearns

_____

UNITED STATES DISTRICT JUDGE